Kenneth GETZ, Petitioner

v.

**PENNSYLVANIA BOARD OF PROBATION AND PAROLE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted Oct. 30, 2009.
Decided Nov. 19, 2009.

---

Ellen K. Barry, First Asst. Public Defender, Carlisle, for petitioner.

Arthur R. Thomas, Asst. Counsel and Victoria S. Madden, Chief Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, FRIEDMAN, Senior Judge, and QUIGLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Kenneth Getz (Getz) appeals from an order of the Pennsylvania Board of Probation and Parole (Board) denying his request for administrative relief and recommitting him for violations of his parole. We affirm the Board's order.

Getz was originally sentenced to serve a state term of three to 10 years for aggravated indecent assault (Megan's Law[1] sex offender). He was released on supervised parole on November 14, 2005, with the mandate that he not have any contact with minor females for any reason. A special parole condition was also imposed that prohibited him to possess photographs of anyone under the age of 18 years or child-oriented videos without prior written permission of Probation/Parole Supervision Staff.

According to a written report by Getz's parole agent dated November 10, 2008, on November 6, 2008, two parole agents were performing a search of his apartment when they found three DVDs on top of Getz's television. The movies were *Shrek*, *Santa Clause 3* and *Superman Doomsday.* Also found were a seven-inch folding lockback knife and a digital camera under Getz's bed. When the digital camera's card was reviewed, it showed four photographs of an approximately eight-year old child holding a cat while sitting on Getz's bed in his apartment. When questioned as to the identity of the child, at first Getz could not identify the child. Then, after about five minutes of questioning, Getz stated that he thought it was his half-brother. Parole Agent Talasky believed the pictures appeared to be that of a female.

At the violation hearing before the Board, Getz admitted that he owned the knife which was given to him by his grandfather and that he had it sitting on display. He had no intention of harming anyone with it because it was just a showpiece. He said he wasn't aware that it was forbidden but he was not given permission to have the knife by the Board. Regarding the pictures that were taken with the camera that was found in his apartment, he stated that he did not take the pictures. He stated that he knew who the child in the picture was—Courtney Griffin's brother—and it was taken either by his sister or Courtney, his ex-fiancé. As for the DVDs that were in his apartment, he said that he had done a remodeling job for the landlord, and that the landlord had given him a whole bunch of DVDs including those that the parole agent found. He also stated that just recently in prison, they showed *Kung Fu Panda* which was a children's movie. Parole Agent Talasky testified that the pictures admitted into evidence of the child were made from the digital card

---

1. *See* 42 Pa.C.S. §§ 9791–9799.

found with the camera from inside Getz's apartment and that the pictures were from the inside of Getz's apartment.

By decision dated March 12, 2009, the Board notified Getz that he was being recommitted to a State Correctional Institution as a technical parole violator to serve 12 months backtime for violating condition # 5B for possession of a weapon; Special Condition # 7 (Count 1) for possession of prohibited photos; and Special Condition # 7 (Count 2) for possession of child-oriented videos/DVDs. The Board indicated that it relied upon his parole agent's testimony, documentary evidence and photos. The notice stated that Getz's maximum release date was November 5, 2010.

Getz filed a request for administrative relief contesting all of the violations for which he received an additional 12 months of backtime. He argued that the Commonwealth failed to prove that he knew of the photos or had taken them. "The photos were on film in a camera in Mr. Getz's room. The film was developed later by someone else and the pictures were taken by someone else. The pictures were nondescript, inoffensive, snapshots of a child approximately 10 years of age. In any case, Mr. Getz did not know about the pictures and did not take them. They were, in fact, not pictures when the parole agent picked them up as film." Regarding the DVDs, Getz argued that the Commonwealth failed to prove that he possessed them with any insidious intent, and that none of them were specifically geared to children. Finally, while Getz was aware that he had a knife, he was not aware that

it was illegal and that it was a family heirloom.

The Board denied Getz's request for administrative relief stating that it determined that sufficient evidence was presented at the violation hearing to recommit him for all three violations based on the credible testimony of the parole agent and the documentary evidence that was presented. "[T]he fact that Mr. Getz offered contradictory testimony does not mean the Board was required to accept his version. *Chapman v. Pennsylvania Board of Probation and Parole*, 86 Pa.Cmwlth. 49, 484 A.2d 413 (1984)." (Board's May 20, 2009 decision.) This appeal by Getz followed.[2]

 First, Getz contends that the Board erred in recommitting him because the Board failed to demonstrate that he violated Special Condition # 7 by possessing photographs of anyone under the age of 18 without the written permission of Parole Supervision Staff.[3] In making this argument, he contends that he was not in possession of "photographs" but only was in possession of a digital camera which contained a digital file that when reassembled, represented someone who appeared to be under the age of 18. He explains:

> A photograph is defined as "a picture or likeness obtained by photography," while photography is "the art or process of producing images on a sensitized surface (as a film) by the action of radiant energy and esp. light." Webster's New Collegiate Dictionary 885 (9th ed.1989). Therefore, in order to be a photograph, the image must be produced on a surface that reacts to radiant energy. Digi-

---

2. Our scope of review of the Board's order is limited to determining whether there was a constitutional violation or an error of law, and whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

3. Getz no longer argues that he did not take the photographs of the child and that the photographs depict the images of a minor male child.

tal imaging does not use such a process; rather, the images are stored in binary form until they are accessed by software that can produce the image. As such, Petitioner was not in possession of a photograph.

Getz continues to explain:

The Commonwealth may argue Petitioner was in possession of a digital depiction because images viewed on a digital screen are digital depictions, which are pictures by definition. However, Petitioner was not in possession of a digital depiction, he was in possession of a binary file. When Petitioner's parole officer picked up the digital camera there were no depictions on the screen as the digital card was stored near the digital camera. (C.R. at 45). Petitioner was not even aware of the depiction as he had not taken it and it was stored unseen in the memory card. (C.R. at 47). In order for the depictions to appear, the officer had to turn on the camera and then physically search through the memory card. (C.R. at 45). Furthermore, in order for the officer to present the images at the hearing, he had to access them himself and print them, as no visible image existed for the court to view. (C.R. at 45). Thus, Petitioner was in possession of a binary code and not a picture as no digital depiction existed at the time.

(Getz's brief at 9–10.)

While the courts of this Commonwealth have yet to address whether images stored on digital media are "photographs" even though they do not have physical form,

courts of other jurisdictions have. *Perry v. Commonwealth*, 438 Mass. 282, 780 N.E.2d 53 (2002), dealt with whether the term "visual material" encompassed computer images for purposes of prosecuting an individual for possession of child pornography with intent to disseminate. "Visual material" was defined under Mass. Gen. Laws. Ch. 272 § 31 (2002), to include "photograph." [4] The defendant, whose computer contained more than 200 images of nude preteen and teenage girls and boys, argued that computer images were not "visual material" under the statute. Concluding that "visual material" included photographs, the Supreme Judicial Court of Massachusetts first stated that the scope of the laws punishing sex offenders reflected the "Legislature's obvious intent to include any visual image created by use of a camera or similar device, regardless of how or where the image is stored. This is clear from the plain language of the statute, interpreted in a commonsense manner." *Id.* at 55. The Supreme Judicial Court went on to explain:

The Legislature labeled the prohibited class "visual material," a broad term. It included within the definition of "visual material" any photograph. The phrase *"any ... photograph"* means what it says, any photograph without limitation. A "photograph" is "a picture, image, or likeness obtained by photography." Webster's Third New Int'l Dictionary 1702 (1993). See American Heritage Dictionary 987 (1970) (photograph is "[a]n image ... recorded by a camera and reproduced on a photosensitive surface"). **In modern parlance, an image**

4. Mass. Gen. Laws ch. 272 § 31 (2002), define "visual material" to include:

Any motion picture film, picture, photograph, videotape, any book, magazine, or pamphlet that contains pictures, photographs or similar visual representations or reproductions. Undeveloped photographs, pictures, motion picture films, videotapes and similar visual representations or reproductions may be visual materials notwithstanding that processing, development or similar acts may be required to make the contents thereof apparent.

**produced by a digital camera is considered "photography," i.e., it is "characterized by great truth of representation or minute detail in reproduction."** Webster's Third New Int'l Dictionary, *supra.* **It matters not that the scene is captured in bytes rather than on conventional film.** See American Heritage Dictionary 507 (4th ed.2000) ("digital photography").

Any lingering doubt whether § 31 included computer images of the type at issue here is dispelled by the use of the word "picture" and the context of the remainder of the section. This convinces us that the Legislature intended the section to reach images produced by any method of photography: conventional, "instant," electronic, **digital,** or some means as yet not invented. **Because § 31 includes visual material even if undeveloped and even if it requires some sort of processing in order to be developed, the means used to store or display the visual material are of no relevance.** The bytes of a computer image can be likened to conventional negatives. The Legislature was unconcerned with how the photographically created image is stored or communicated. So, too, it would not matter to the child whose humiliation is captured and permanently preserved on the Internet that the image is digital rather than conventional; indeed, this same permanence and the ease of transmission make the activity all the more pernicious for such a child.

*Id.* at 56. (Emphasis added.) *See also State of Washington v. Rosul,* 95 Wash. App. 175, 974 P.2d 916 (1999) (statute prohibited possession of "visual or printed matter defined as any photography or other material that contained a reproduction of a photograph; vagueness challenge of statute rejected because statute clearly proscribed possession of digitized materi-

als which contained reproductions of child pornography.")

In *State of Florida v. Cohen,* 696 So.2d 435 (Fla.Dist.Ct.App.1997), child pornography was discovered on the hard drive on defendant's computer. Defendant argued that he did not violate Fla. Stat. Section 827.071(5) (1995) which provided that it was unlawful for any person to knowingly possess a "**photograph,** motion picture, exhibition, show, representation, or other presentation which in whole or in part, he knows to include any sexual conduct by a child." (Emphasis added.) The defendant claimed that he did not violate the statute because the statute did not prohibit possession of pornographic images on a computer hard drive as the computer image was not possessed unless and until several steps were taken to view the image. "To view a computer image, the computer system must be turned on, the monitor turned on, the appropriate program loaded, and the program ordered to search a particular file. Therefore, defendant phrases the sole question on appeal as 'whether raw, unconfigured, and undeciphered electrical impulses constitute a photograph, motion picture, show, representation or other presentation.'" *Id.* at 437.

The District Court determined that the pornographic images could qualify under the statute as photographs by dictionary definition. "[D]igital cameras are now commercially available that take high-quality images that can be downloaded and viewed on a computer without the need for either film processing or scanning of photographs." *Id.* at 438, n. 5. Relative to this case before us, the District Court stated:

In *United States v. Smith,* 795 F.2d 841 (9th Cir.1986), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1964, 95 L.Ed.2d 535 (1987), the defendant similarly argued that unprocessed, undeveloped film did

not constitute a "visual depiction" within the terms of the federal pornography statute because "substantial, complicated, and costly developing must be done before any visually perceptible image is created." *Id.* at 846. The ninth circuit noted that "visual depiction" was not defined by statute.

While agreeing that color film must "undergo an elaborate developing process before any image can be perceived by the human eye," the ninth circuit concluded that exclusion of unprocessed film would be inconsistent with congressional intent; the fact that the film was undeveloped does not eliminate the harm to the child victims from the taking of the photographs. *Id.* at 846–47.

The District Court went on to state that "Our supreme court has declared that the 'sexual exploitation of children is a particularly pernicious evil.' *Schmitt,* 590 So.2d at 404. The 'obvious purpose' of section 827.071 'is to prohibit certain forms of child exploitation ... [i]t is intended to regulate types of conduct and *depictions* of such conduct.'....It has been uniformly recognized that computer technology has made transmission of both text and visual images easier and faster than traditional methods such as the mail-even with overnight delivery. The use of computers to transmit and possess child pornography can only increase the market for child pornography-especially with the clarity of images, the speed of transmission, and the

ability to upload or download the images with ease." *Cohen,* 696 So.2d at 440.

Although technological advances will continue to be made with different and faster means of producing images, the results are still the same—photographs. Following that reasoning, we also conclude that images produced from digital cameras are photographs.

No matter whether the term "photograph" normally would include "computer images," Getz argues that because 18 Pa. C.S. § 6312(d)(1) of the Crimes Code defines computer images separately—"photographs, *computer depiction or other material* depicting a child under the age of 18 years"—that means that prohibited photographic images of minor females in Special Condition # 7 (Count 1) cannot be extended to include computer images of minor females because the Crimes Code treats computer images differently. We disagree.

The purpose of 18 Pa.C.S. § 6312(d)(1) is to define and grade the offense of possession of child pornography.[5] Unlike that section, which is used to determine which sexual crime has been committed involving a child, the purpose of special conditions of parole for sex offenders with minor victims is to ensure that they do not repeat their previous crime. Having already committed a sex crime, the Board specified which conditions it wanted Getz to abide by in its conditions to meet his particular offense. The purpose of Special Condition # 7

---

5. 18 Pa.C.S. § 6312(d).

(1) Any person who knowingly possesses or controls any book, magazine, pamphlet, slide, *photograph*, film, videotape, *computer depiction* or other material depicting a child under the age of 18 years engaging in a prohibited sexual act or in the simulation of such act commits an offense.

(2) A first offense under this subsection is a felony of the third degree, and a second

or subsequent offense under this subsection is a felony of the second degree.

"Prohibited sexual act" is defined as "sexual intercourse as defined in section 3101 (relating to definitions), masturbation, sadism, masochism, bestiality, fellatio, cunnilingus, lewd exhibition of the genitals or nudity if such nudity is depicted for the purpose of sexual stimulation or gratification of any person who might view such depiction." 18 Pa.C.S. § 6312(a).

(Count 1) was to ensure that Getz did not possess any photographs or other pictures of a minor child. Just because the Board did not itemize every means of possessing child pornography in Special Condition # 7 (Count 1)—that is, to include digital photography—did not mean that it intended to be more lenient in its approach with handling a known Megan's Law sex offender than did the General Assembly when enacting 18 Pa.C.S. § 6312(d). Consequently, the four images of a child under 18 years of age produced from the digital card that Getz possessed are "photographs," and the Board did not err in finding him in violation of Special Condition # 7 (Count 1).

Getz next argues that the knife he possessed was a "curio" he kept on display for sentimental purposes because it used to belong to his grandfather and he had no intent to use it as a weapon. Relying on *Macik v. Pennsylvania Board of Probation and Parole*, 106 Pa.Cmwlth. 352, 526 A.2d 460 (1987), Getz contends that in order for the Board to prove that he possessed a weapon in violation of his parole, it must prove that he did not possess a legitimate reason for the possession of that weapon.

In *Macik*, a parolee was found in violation of his parole and during a search of his home, a utility knife was found in its sheath. The parolee testified that he used it to install insulation around the windows of his home. The Board found him in violation of condition 5B of his parole for possessing a knife. The parolee appealed, arguing that he had a legitimate purpose for possessing the knife which was not a weapon. The Board relied upon *Michael v. Pennsylvania Board of Probation and Parole*, 85 Pa.Cmwlth. 173, 481 A.2d 711 (1984), where the parolee was arrested for leaving the scene of an accident at which time he was found possessing a knife. The

parolee argued that it had a utilitarian purpose and was not a weapon per se. In *Michael*, we held that in the absence of a definition of the word "weapon," under 37 Pa.Code § 63.4(5)(ii), the Board was not wrong in finding that the knife was a weapon for parole violation purposes because there was no proof that the parolee was using the knife for a legitimate purpose. In *Macik*, we ultimately determined that the parolee testified that he used the knife to install insulation which was a legitimate purpose but the Board did not make a specific finding on that testimony. "If it were otherwise, a parolee would be in violation of his parole every time he picked up a steak knife to eat dinner, or a sickle to cut weeds. We cannot believe that even under the Board's broadest definition of the term 'weapon' it was meant to include such a result." *Macik*, 106 Pa.Cmwlth. at 355, 526 A.2d 460. We then vacated and remanded the matter to the Board for further findings on the issue of whether the parolee's knife was a weapon.

In this case, the seven-inch folding lockback knife is not a dual purpose cutting instrument; just a knife. As the Board commented, "The *Macik* rule is not a loophole to enable a devious parolee to possess a lethal weapon so long as he says that it is a 'curio.'" (Board's brief at 11.) Moreover, the Board did not find credible Getz's explanation that his knife was a "displayed curio." By possessing a knife, Getz possessed a weapon, and the Board properly found him in violation of Special Condition # 5B.

As to the final violation—the three videos that were found on top of Getz's television, Getz argues that the Board erred in finding him in violation of Special Condition # 7 (Count 2) because all of the movies are geared towards families and not just young children. Special Condition # 7 (Count 2) specified: "You must not

purchase or possess items designed to appeal primarily to persons under the age of 18 years old, including, but not limited to, children's clothing, toys, games, books, dolls, stuffed animals, **child-oriented videos**, etc." [6]

In response, the Board argues that it may take official notice of facts that are obvious and notorious to persons of common intelligence, and a Court may take judicial notice of the content of a film. "It is obvious and notorious to an American of common intelligence that DVDs of the films *Shrek, The Santa Clause 3: The Escape Clause and Superman: Doomsday* are child-oriented videos, standard tools for grooming children for molestation. Therefore, the Board properly took official notice of the fact that those DVDs are child-oriented videos and found that Getz violated a special condition of his parole that proscribed possession of child-oriented videos by possessing those DVDs." (Board's brief at 14–15.)

 The problem with the Board's argument is that there were no facts that made it "obvious and notorious" that those films were directed at children. At the revocation hearing, no evidence was presented regarding each movie's content, its rating, and whether the movie was marketed to young children. Simply placing the three movies into evidence and now saying that it was "obvious and notorious" that they were used as tools for grooming children for molestation alone is insufficient for the Board to make out a violation of Special Condition # 7 (Count 2).

**6.** Getz further argues that the condition is unconstitutionally vague "because in today's society children are playing with video game systems, beanie babies, and action figures. All of these items not only have an under 18 appeal, they also appeal to a large number of adults. According [sic] the Entertainment

Nonetheless, because the Board proved the other two violations of Getz's parole, it properly revoked his probation. *See Washington v. Pennsylvania Board of Probation and Parole,* 73 Pa.Cmwlth. 432, 458 A.2d 645 (1983). Accordingly, the order of the Board is affirmed.

### *ORDER*

AND NOW, this *19th* day of *November,* 2009, the order of the Pennsylvania Board of Probation and Parole, dated May 20, 2009, is affirmed.

Software Association the average video gamer is 35 years old. http://www.theesa.com/facts/index.asp. Beanie babies, action figures, and other 'children's' toys are more and more being sold as collectibles, meaning they are being bought more and more by adults for adults." (Getz's brief at 17.)